# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUCKEYE FAMILY HOUSING,<br>A WASHINGTON LIMITED PARTNERSHIP<br>5460 Champery Place NW<br>Issaquah, WA 98027-7873,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>BROOKE L. ROLLINS, *in her official capacity*<br>*as Secretary of Agriculture*<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>RURAL DEVELOPMENT,<br>1400 Independence Avenue, S.W.<br>Washington D.C. 20250,<br><br>TODD LINDSEY, *in his official capacity as*<br>*Deputy Under Secretary for Rural Development,*<br>*U.S. Department of Agriculture Rural Development*<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>LORI URBAN, *in her official capacity as the*<br>*Arizona Rural Development State Director,*<br>230 North First Avenue, Suite 206<br>Phoenix, Arizona 85003,<br><br>Defendants. | Case No. 1:25-cv-02007<br><br>**COMPLAINT FOR REVIEW OF**<br>**AGENCY ACTION AND**<br>**DECLARATORY RELIEF UNDER**<br>**THE ADMINISTRATIVE**<br>**PROCEDURE ACT** |

1    NOW COMES Buckeye Family Housing, a Washington Limited Partnership (hereinafter

2  "Buckeye" or "Plaintiff"), by and through its undersigned counsel, and files this civil action seeking

3  review of agency action and declaratory relief under the Administrative Procedure Act based on the

agency's arbitrary and capricious deprivation of Plaintiff's statutory right to a "market value" appraisal in the sale of its affordable housing property at issue here to any qualified nonprofit organization or public agency, as mandated by the plain language contained in the Emergency Low Income Housing Preservation Act ("ELIHPA" or "the 1988 Legislation"). (Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988), *codified as amended at* 42 U.S.C. § 1472(c), page number one to the Addendum attached hereto (Addendum ("Add.") at 1)).

Accordingly, Plaintiff states and alleges the following in support of this action:

## PRELIMINARY ALLEGATIONS[1]

1.    This action arises from an Administrate Law Judge's holding, and subsequent administrative appellate affirmance, that the United States Department of Agriculture's ("USDA's") Rural Development Agency ("RD" or "Agency") can impose a purported full term of this mortgage restrictive-use provision in the deed of trust for a mortgage loan, despite no statutory, regulatory, or Agency handbook language permitting or even contemplating such a restrictive-use provision.

2.    In so holding, the Administrative Law Judge endorsed an arbitrary and capricious agency action that voids Plaintiff's statutory right to a market evaluation necessary to effectuate a meaningful sale of Plaintiff's affordable housing property commonly known as Sierra Verde Apartments ("Sierra Verde").

3.    In addition to its erroneous legal holding, the Administrative Law Judge permitted RD to withhold a key witness without imputing an adverse inference against RD and impermissibly used Plaintiff's mitigation attempts as a cudgel against Plaintiff's claims.

---

[1]    To understand this action, Plaintiff must explain an extensive legislative and regulatory history, a long substantive factual background, and the sizeable procedural history arising from the administrative challenge. Plaintiff has endeavored to keep this Complaint as concise as possible while pleading sufficient information to permit this Court to appropriately evaluate its claims.

4.     Plaintiff operates Sierra Verde pursuant to a Housing Act of 1949 Section 515 mortgage loan issued pursuant to the USDA's Rural Rental Housing Program (the "Section 515 Program"). This program, formerly administered by the Farmers Home Administration ("FmHA") and currently administered by RD, provides direct 40- or 50-year term loans to owners/developers that contract with RD to build or rehabilitate affordable multifamily and senior rental housing in rural areas for low- and moderate-income families, the elderly, and people with disabilities (the "Section 515 contracts").

5.     Section 515 of the Housing Act of 1949 originally empowered property owners like Plaintiff with two alternative means of terminating a property's participation in that program before the expiration of the 40- or 50-year term of its mortgage loan:

> (i)     each owner/developer had the contractual option to terminate the use of its property as affordable housing by prepaying its mortgage loan without restrictions at a time of its own choosing during the term of the mortgage (the "contractual termination option"), and

> (ii)     the Government, by contract, was authorized to require each owner/developer to prepay its mortgage loan without restrictions when commercial financing became available (the "graduation requirement").

6.     The above two means of terminating participation in the Section 515 Program before the mortgage loan expires entitled the owner/developer of a Section 515 property to pursue its "market value" by one or both of two methods:  (i) to raise its rents to market-rate levels, and/or (ii) to sell that property on the open market at a market-rate or conventional housing price.

7.     In the statutory provision at issue, ELIHPA, along with other subsequent acts and regulations, mandates that "the Secretary **shall** require the borrower . . . to offer to sell [its] assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair ***market value*** determined by 2 independent appraisers . . ." (Add. at 1) (emphasis supplied).)

8.     RD has deprived Plaintiff of the "market value" appraisal to which it is entitled under statute and regulation by imposing unauthorized conditions upon Plaintiff's statutory right to a "market value"

appraisal in a sale to a qualified nonprofit organization or public agency, thereby precluding Plaintiff from pursuing a "market value" for its property.

9.      This is not the first time that attempts to sell Section 515 Program properties have faced legal interference. Specifically, in the *Franconia* line of cases (including *Franconia Associates v. United States*, 536 U.S. 129, 148 (2002) and *Franconia Associates v. United States,* 61 Fed. Cl. 718, 732-33 (2004)), the courts held that ELIHPA anticipatorily repudiated the original two means – summarized above at Paragraph No. 5 – of terminating a property's Section 15 Program participation prior to the expiration of its mortgage loan.

10.     Specifically, the Court of Federal Claims ("COFC") held that ELIHPA repudiated the contractual termination option of all owners/developers by prohibiting RD from accepting any prepayment request submitted by an owner/developer unless it satisfies specific conditions one of which, pursuant to Paragraph (4)(A) of ELIHPA, permits the owner/developer to re-submit its prepayment request after signing a new restrictive-use provision of no less than twenty years to commence upon its agreement to accept various incentives offers.

11.     Contemporaneous with this repudiation, however, ELIHPA also established three exceptions to the statute's prohibition of RD's ability directly to accept an unrestricted prepayment request from an owner/developer, each of which enable that owner/developer to pursue its property's "market value" before the expiration of its mortgage loan term.

12.     The three exceptions, each of which is implicated in this action, are:

> (1) pursuant to Paragraph (5)(G)(ii) of ELIHPA, if RD determines (i) that housing opportunities for minorities will not be adversely affected, and (ii) that there is *no longer a need* for affordable housing where a subject property is located, RD must accept the owner/developer's prepayment request (the "no need" exception to ELIHPA) (42 U.S.C. § 1472(c)(5)(G)(ii));
>
> (2) pursuant to Paragraph (5)(A)(ii) of ELIHPA, if after the submission of a prepayment request an owner/developer will not surrender the contractual

termination option and agree to extend the low-income use of its property for at least twenty years, ELIHPA compels that owner/developer to offer its property, priced pursuant to a "market value" appraisal, for sale to any qualified nonprofit organization or public agency for a six-month period and in the event that, upon expiration of said six-month period, *no such entity* has made a bona fide offer to purchase, RD may accept the prepayment request (the "no six-month sale" exception to ELIHPA) (42 U.S.C. § 1472(c)(5)(A)(ii)); and

(3) pursuant to Paragraph (5)(A)(i) and (B)(i)(II) of ELIHPA, if the sale of a prepayment requesting owner's/developer's property to any qualified nonprofit organization or public agency proceeds effectively, such that a bona fide offer to purchase, based upon a "market value" appraisal, is made and accepted by an owner/developer within six months, that owner/developer will have *succeeded in realizing the sale* of its property on the open market premised upon a market-rate or conventional housing price, albeit the property itself will continue to be subject to Section 515 regulatory covenants for the remaining useful life of the housing and related facilities (the "six-month sale" exception to ELIHPA) (42 U.S.C. § 1472(c)(5)(A)(i) and (B)(i)(II)).

13.    The first exception was implicated here when RD determined that Plaintiff, upon submission of a prepayment request, was not eligible for the no-need exception, and Plaintiff ultimately opted to participate in the six-month sale to any qualified nonprofit organization or public agency premised upon a "market value" appraisal.

14.    The second and third exceptions to ELIHPA are directly at issue in this case by reason that RD also determined that Plaintiff was disqualified from its fundamental right to obtain a "market value" appraisal establishing a conventional or market-rate price point initiating negotiations for the sale of its property to any qualified nonprofit organization or public agency.

15.    If the statutory conditions of one of these three exceptions may be satisfied when a prepayment request is made, RD must (i) accept the owner's/developer's prepayment request, (ii) recognize the owner's/developer's right to offer its property for sale to any qualified nonprofit organization or public agency based upon a "market value" appraisal, or (iii) recognize the sale of the owner's/developer's property to any qualified nonprofit organization or public agency based upon a "market value" appraisal.

16.     By and through its specific requirements, ELIHPA's mandate does not permit any qualification of the use of "market value" appraisals in the evaluation of properties sold to any qualified nonprofit organizations or public agencies. But that is exactly what RD has done.

17.     Accordingly, this case implicates RD's attempt – rather than any *congressional* effort – to place untenable and unlawful conditions upon ELIHPA's second and third means of pursuing a property's "market value."

18.     The facts alleged herein present a series of arbitrary and capricious examples of decision-making by RD personnel that, through what will be shown below to be the effect of a spurious bureaucratic form and other related and unlawful Agency policies and other conditions, impede RD's ability to properly interpret ELIHPA and its implementing, statutorily authorized regulations setting forth Plaintiff's entitlement to a "market value" appraisal. Such arbitrary and capricious RD policies and conditions preclude RD from permitting Plaintiff to realize what some within RD do recognize as Plaintiff's statutory right to obtain a "market value" appraisal.

19.     The allegations set forth herein will establish that certain requirements laid down in various legal authorities – including (i) ELIHPA itself, (ii) ELIHPA's implementing regulations, and (iii) RD's Agency handbook – all entitle Plaintiff to pursue the "market value" of its property.

## **PARTIES**

20.     Buckeye is a limited partnership organized under the laws of the State of Washington with a principal place of business located at 9299 North 113th Way, Scottsdale, Arizona 85259. Buckeye has owned Sierra Verde since entering into a Section 515 contract with RD in 1989 for an initial mortgage loan term of fifty years duration.

21.     The U.S. Department of Agriculture is the department tasked by the United States Congress with implementing regulations to effectuate ELIHPA.

22.     Brooke L. Rollins is the Secretary of Agriculture and is sued in her official capacity. As part of her official duties, she is answerable for the actions of the U.S. Department of Agriculture ("USDA") and its agencies, and for ensuring the proper application of USDA's enabling statutes and regulations.

23.     Rural Development is an agency of the U.S. Department of Agriculture.[2] At all times relevant to the allegations herein, RD and its respective officials and employees acted as agents of RD.  As used herein, "RD" or "Agency" shall refer to Rural Development or its predecessor agencies, as appropriate.

24.     Todd Lindsey is the Deputy Under Secretary for Rural Development and is sued in his official capacity. As part of his official duties, he is answerable for the actions of RD and for ensuring the proper application of USDA's Rural Development regulations.

25.     Lori Urban is the Arizona Rural Development State Director and is sued in her official capacity. As part of her official duties, she is answerable for the actions of the Arizona RD office and for ensuring the proper application of RD's regulations in Arizona.

## **JURISDICTION AND VENUE**

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. § 2201, *et seq.*

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because this is an action against an administrative agency of the United States of America brought in the district where the agency resides.

---

[2]     Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 (Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994)), the Secretary of the USDA was authorized to establish a successor agency to the FmHA known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS").  (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the USDA known as "Rural Development."

## **STATUTORY AND REGULATORY BACKGROUND**

28.    Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities.

29.    During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private owners/developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

30.    In furtherance of this changed approach, Congress authorized the FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States.

31.    Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968)) (now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "RD projects."

32.    Those loan holders that entered into a Section 515 contract before December 21, 1979 (the "pre-1979 RD contracts") are contractually entitled to terminate their participation in the Section 515 Program by exercising their option to prepay at any time. Such a prepayment would enable them to "go to market" and use or dispose of their property by either (i) raising the property's rents to commercial rates, or (ii) selling the property for its commercial fair market value.

33.    Those loan holders that entered into a Section 515 contract on or after December 21, 1979, and before December 15, 1989 (the "post-1979 RD contracts") are also contractually entitled to exercise their option to prepay at any time.

34.    However, all post-1979 RD contracts are subject to a fifteen (15) or twenty (20) year initial restrictive-use provision that requires the property to be operated as low-rent housing during that period. This restrictive-use provision is binding upon the owners/developers and their successors in interest.

35.    Plaintiff entered into a post-1979 RD contract and agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve one housing project and to enter into a loan agreement with RD.

36.    The loan agreement, *inter alia*, imposed significant obligations upon Plaintiff regarding the tenants, rents, profits, and maintenance and financial operation of the project (the "low-income affordability restrictions").

37.    Contemporaneous with the execution of the loan agreement, and as referenced therein, the Plaintiff executed, *inter alia*, a promissory note and a real estate deed of trust.

38.    In executing the promissory note, Plaintiff promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the loan agreement, together with interest at a specified rate. The promissory note provided, *inter alia*, "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower . . . ." (the "unfettered prepayment right"). (App. Ex. M at 2 of 9.)[3]

39.    By signing the loan agreement and the promissory note referenced therein, Plaintiff promised, *inter alia*, (i) to construct and maintain housing in accordance with RD's specifications, (ii) to use Sierra Verde for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate RD

---

[3]    The testimony and documents cited herein are part of the administrative record to be filed with the Court in due course pursuant to Rule 7(n) of the Rules of the United States District Court for the District of Columbia. "App. Ex." refers to Appellant's exhibits that Plaintiff submitted during the USDA's National Appeals Division ("NAD") administrative hearing.

regulations, (iii) to charge no higher rents than those permitted by RD, (iv) to make timely payments on its mortgages, and (v) to maintain certain cash reserves.

40.     In exchange, the Government agreed to allow Plaintiff to free itself of RD's regulatory strictures in accordance with the contractual provisions of the promissory note.

41.     The loan agreement obligates Plaintiff to operate its housing project in accordance with RD regulatory strictures only so long as Plaintiff's indebtedness and other obligations under the promissory note, real estate deed of trust, and any related agreement remain unsatisfied.

42.     Thus, Plaintiff's obligation under the loan agreement to operate Sierra Verde in accordance with RD regulations expires upon its prepayment in full of its indebtedness and satisfaction of any related obligations.

43.     Consistent with the language of the promissory note, RD regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit Plaintiff to prepay its mortgage loan at any time at its option, so long as it and its successors in interest continue to comply with any restrictive-use provision contained in the real estate deed of trust.

44.     Accordingly, Plaintiff is entitled to terminate its RD contract by prepaying its deed of trust loan at any time at its option to enable it to go to market and maximize its return on investment upon the expiration of any restrictive-use provision (the "contractual termination right").

45.     Notwithstanding Plaintiff's contractual termination right, the Government repudiated its obligation to recognize Plaintiff's right when, on February 5, 1988, Congress enacted Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note) ("ELIHPA" or "the 1988 Legislation").)

46.     The 1988 Legislation contained measures designed to place pre-1979 RD contract holders "on the same playing field" as the post-1979 RD contract holders, who were subject to either a 15 or 20-year initial restrictive-use provision. For example, a pre-1979 RD contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

47.     Consistent with the provisions of existing post-1979 RD contracts already containing initial restrictive-use provisions, the 1988 Legislation recognized the contractual right of post-1979 RD loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the properties were maintained as low or moderate-income housing for the initial period of fifteen (15) or twenty (20) years from the date of loan origination.

48.     The 1988 Legislation repudiated the contractual right of pre-1979 RD contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.) Although denominated as an "interim measure," the 1988 Legislation specifically amended Section 502(c) of the Housing Act of 1949 and did not expire automatically.

49.     Instead, on October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)) ("The 1992 Legislation" or "Title VII").)

50.     The 1992 Legislation, in addition to making permanent the "interim" repudiation of the contractual termination right of pre-1979 RD loan holders, made permanent for *all* contracts formed before December 15, 1989, the restrictions that ELIHPA had imposed on pre-1979 RD contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

51.     Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 RD contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of RD projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

52.     The 1992 Legislation authorizes RD, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of RD contracts, which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their properties.

53.     In general, the incentives offers allow owners whose projects satisfy various guidelines to apply for: (i) increases in the rate of return on investment, (ii) reductions of the interest rate on the mortgage loan, (iii) additional rental assistance, and (iv) equity loans. (42 U.S.C. § 1472(c)(4)(B).)

54.     For those RD loan holders unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said holders' properties to qualified nonprofit organizations or public agencies approved by RD. These entities are required to maintain the projects as low-income housing for the remaining useful life of the housing and related facilities, subject to RD's approval of financial assistance to the prospective purchasers.

55.     Under the lengthy, cumbersome, and costly procedures required, such RD loan holders are required to offer their properties for sale to such purchasers for a period of six (6) months without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) – (F).)

56.     Such forced sale proceedings can be avoided only if:

1    (i) the RD loan holder agrees to continue to operate its property as low-income housing for

2    a period determined by the Secretary, but not less than twenty (20) years from the date of

3    loan origination, and to subject itself to the forced sale proceeding at the end of that period,

4    or

5    (ii) the Secretary determines that housing opportunities for minorities will not be materially

6    affected as a result of the prepayment and that either

7    (a) tenants will not be displaced, or

8    (b) there is an adequate supply of affordable rental housing within the market area

9    of the housing that is assured of being made available to all current tenants. (42

10    U.S.C. § 1472(c)(5)(G); the "no-need" exception to ELIHPA.)

11    **<u>SIERRA VERDE APARTMENTS</u>**

12    57.    Plaintiff owns Sierra Verde, a Section 515 Program property with forty units located at 150 North

13    Apache Road, Buckeye, Arizona 85326, approximately fifteen minutes away from Phoenix, Arizona. (*See*

14    NAD, Case No. 2022W000154, Appellant's Exhibits ("App. Exs.") J-Q; NAD, Case No. 2022W000154,

15    Hearing Transcript Track 1 of 5 (Each Track will hereinafter be designated as "I/", "II/", "III/", "IV/" or

16    "V/"), I/60:3-61:7.)

17    58.    To fund the purchase of its property, Buckeye executed a promissory note (App. Ex. M) and deed

18    of trust (App. Ex. N) on August 25, 1989, thereby entering into a post-1979 RD contract. (App. Exs. M

19    and N.)

20    59.    The promissory note provided the unfettered prepayment right language, and the deed of trust

21    included a twenty-year restrictive-use provision that prohibited Plaintiff from exercising its contractual

22    termination right until August 25, 2009. (*Id.*; App. Ex. N at 6 of 6.)

60.     Terry Campbell, a "General partner" and "owner" of Buckeye, developed Sierra Verde through a company he formed with Jim Hogue named Campbell-Hogue & Associates, Inc. ("Campbell-Hogue") (*See* I/52:11-23, 53:11-23.) Altogether, Campbell, either independently or through Campbell-Hogue, developed approximately forty Section 515 properties, where "19 or 20" of them, like Sierra Verde, entered into Section 515 loans that closed before December 15, 1989, and therefore hold RD contracts containing the contractual termination right. (*Id.* 53:11-23.)

61.     When developing these Section 515 properties, Campbell and Mr. Hogue sought to "identify properties that were close to metro markets that we thought would have long-term potential so that at the end of the 20-year period we may have the option to convert to a ***market rate*** if the market dictated." (*Id.* 54:16-22; emphasis supplied.) For example, for properties that Campbell developed in Utah, he noticed that "up and down the I-15 corridor and southern Utah" there was "a growing kind of a resort community," and that a "lot of retirees from Salt Lake had moved there." (*Id.* 54:25-55:15.) Campbell further thought about "[p]roperty – community growth, rent growth, population growth," areas "that down the road would have some value." (*Id.* 55:18-21.)

62.     With respect to those properties involving loans closed before December 15, 1989, Campbell's intentions regarding "value" related to the prepayment right, specifically that while the properties involved a "pretty minimal return" within the Section 515 Program, value could be maximized "when the 20 years expired[.]" (*Id.* 56:15-57:8.)

63.     In fact, implementing this intent, before requesting the prepayment of Sierra Verde's mortgage loan, Campbell-Hogue had requested to prepay at least six of its Section 515 properties with pre-December 15, 1989, closing dates that held the contractual termination right. (*Id.* 57:15-17.)

64.     The deliberative process and intentions regarding Sierra Verde began by selecting Buckeye, Arizona, as the property location, a town that was the closest eligible western town within the Phoenix

market. (*Id.* 60:3-61:12.) The western side was specifically selected because other directions included "quite a bit of state-owned land and a large amount of tribal land," and because Buckeye sat "on a major interstate between Phoenix and Los Angeles[.]" (*Id.*) Campbell concluded that Buckeye ultimately proved a good choice for Sierra Verde because, at the time of the closing, "there were 5,000 people," whereas today, "there's 50,000." (*Id.*)

65.    Consistent with his intentions, at the closing, Campbell "was very careful" to ensure that the closing documents contained "a 20-year clause" that ensured that the property had "the 20-year out, option to get out if the property could support converting to market rate." (*Id.* 63:10-22.)

66.    Campbell's confirmation of the presence of the twenty-year restrictive-use provision found in the deed of trust for Sierra Verde, the "20-year language that [he always] looked for," reflected his intention to prepay the loan if his decision regarding location proved correct. (*Id.* 63:10-66:14.)

67.    Campbell testified that he was approximately forty-three years old when he closed the loan for Sierra Verde in 1989, meaning that should Buckeye be prohibited from exercising its contractual termination right after the expiration of its twenty-year restrictive-use provision in 2009, he would be over ninety years old when the property's original fifty-year mortgage loan terminates in 2039. (*Id.* 62:6-19.)

68.    Campbell emphasized that he intended to take the property to the conventional market long before he reached such an advanced age so that he could realize a meaningful return on his initial investment. (*Id.* 56:15-57:8, 62:21-63:22.)

69.    Sometime during "the '90s," "when ELIHPA became extended to the point where it affected our property" (*Id.* 69:7-9,) Campbell realized that Congress had changed the law "called ELIHPA" to affect post-1979 RD contract holders like Buckeye and now "we had the same issue that the prior developers [*i.e.,* the pre-1979 contract holders] had with" it. (*Id.* 67:18-68:4.)

70.     Campbell "figured out that maybe we don't have this 20-year free – free prepayment without any restrictions." (*Id.* 67:24-68:1.)

### The 2001 Subsequent Repair Loan

71.     "[T]en years or so" after closing on the loan for Sierra Verde, Campbell concluded that the property needed substantial repair work for the existing property units. (*Id.* 68:12-70:2.)

72.     Around that time, "out of the blue," RD notified Buckeye that it had "some subsequent loan dollars." (*Id.*) Campbell interpreted the message as a "kind of … use it or lose it" proposal from RD because the money "might go back into the general fund" at the end of the fiscal year. (*Id.*)

73.     At this same time, because of the 1992 Legislation, Campbell believed that "we're in this thing for the long term, well beyond 20 years, [and thus] having a 1 percent loan is not a bad deal." (*Id.*)

74.     Although he originally thought "we'll potentially fund [the cleanup] ourselves," Campbell decided to move forward with a subsequent loan from RD for purposes of repair (the "repair loan"). (*Id.*)

75.     Campbell's correct understanding of the 1992 Legislation helped drive his decision-making regarding the requisite repair work. When RD approached *him* about available financing, Campbell assessed the opportunity within the context that RD had already eliminated Plaintiff's contractual termination right, thereby precluding the partnership's ability to capitalize on its investment, and had severely restricted if not eliminated the availability of commercial financing for maintenance purposes.

76.     Facing limited options, on June 26, 2001, Campbell, on behalf of Plaintiff, closed on the subsequent loan for purposes of repair with RD and executed a Deed of Trust for Arizona with Assignment of Rents (the "2001 deed of trust"). (*See* App. Exs. P and Q.)

77.     The 2001 deed of trust, Section 14 (Governing Law and Severability), confirms that the agreement "shall be governed by federal law" and "shall be subject to the present regulations of Lender, and to its future regulations not inconsistent with the express provisions hereof." (App. Ex. Q at 4 of 9.)

78.     As discussed below, both applicable statutes and statutorily authorized regulations in effect at the time mandated that a restrictive-use provision for a term of 20 years be included in all subsequent loans made by RD, including the repair loan closed on by Plaintiff for Sierra Verde.

79.     Despite RD's clear mandate regarding subsequent loan restrictive-use provisions for a term of 20 years, the 2001 deed of trust provided for execution to Campbell provides that "[t]he borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in section 515 … and regulations then in effect *during the full term of this mortgage*." (App. Ex. Q at 8 of 9 (emphasis supplied).)

80.     The 2001 deed of trust contains a 30-year mortgage term for the repair loan expiring on June 26, 2031. (App. Ex. Q at 1 of 9.) This same 2001 deed of trust also reiterates Buckeye's underlying obligations pertaining to its original 50-year mortgage loan expiring on August 25, 2039. (*Id.*)

81.     Campbell reasonably but mistakenly believed that the "full term of this mortgage" language accomplished nothing other than a summary of ELIHPA's removal of the "20-year free – free prepayment without any restrictions." (I/67:25-68:1.)

82.     Indeed, Campbell thought of the 2001 deed of trust as "*combining*" both the original mortgage (terminating in 2039) and the repair loan mortgage (terminating in 2031) (I/70:11-13) "for the long term" period of the "full term of this mortgage," or until August 25, 2039. (I/69:7-12; App. Ex. Q at 8 of 9.)

83.     In closing on the repair loan for Sierra Verde, Campbell did not negotiate the closing documents with the USDA and in fact does not "remember being able to negotiate any document with USDA," despite "doing a number of deals with USDA[.]" (I/70:7-22.)

84.     Rather, he and his Campbell-Hogue team "just assumed that the documents they put in front of us were based on their regulations and – and those regulations came from laws that were passed whenever.

1    So we really had no reason to question because nothing was negotiable that we were aware of." (I/70:19-

2    71:1.)

3    85.    Sometime after closing on the repair loan, Campbell learned about the above-described narrow

4    exceptions to ELIHPA enabling owners/developers to prepay their mortgage loans and/or sell properties

5    within the Section 515 Program. (I/57:9-17, 71:16-72:16.)

6    86.    Campbell-Hogue developed a system designed to take advantage of these exceptions, creating an

7    eligibility list that tracked the expiration date of each of its Section 515 property's applicable restrictive-

8    use provisions. (I/71:16-72:10.) But Campbell-Hogue did not initially include Sierra Verde on that list

9    because its administrator erroneously believed that it did not qualify for any ELIHPA exceptions by reason

10    that subsequent loans precluded prepayment. (I/72:10-73:3.)

11    87.    Campbell later learned that a "rehab loan, as long as it did not increase the number of units used

12    for repair or rehab," did in fact permit prepayment. (I/73:5-7; App. Ex. P at 2 of 3 (prepayments prohibited

13    only for Section 515 loans "made to build or acquire new units").)

14    88.    He also learned at the same time, likely from RD's Agency handbook (*see* App. Ex. H at 10 of

15    11), that such repair loans, qualifying for prepayment, were subject to a 20-year restrictive-use provision.

16    (I/73:3-9.) Campbell did not then perceive that anything contrary to that was contained in the closing

17    documents for Plaintiff's repair loan.

18    89.    Years later, when it became apparent that the commercial real estate market in Buckeye, Arizona

19    was "moving," Campbell authorized and instructed David Rae, the Chief Financial Officer of Campbell-

20    Hogue, to prepare a prepayment request for Sierra Verde and worked with him closely during that process.

21    (I/75:7-25.)

22    90.    Rae both prepared the prepayment request and communicated with RD throughout the process.

23    (II/9:2-10:24.)

91.    As Rae testified, Buckeye requested prepayment for Sierra Verde because he and Campbell thought "it was appropriate to see if we could convert to market rate apartments or sell it at a market value in the program." (II/10:12-15.) Thus, on September 30, 2020, Buckeye submitted a request to prepay its mortgage loans. (App. Ex. R at 1 of 10.)

92.    While a standard effective date for the requested prepayments would have been 180 days from submission of the request pursuant to applicable regulations (I/74:9-11), Campbell and Rae chose to extend the effective date by an additional three months and requested to prepay by June 30, 2021 (App. Ex. R at 2 of 10) – four days *after* what constituted a June 26, 2021 expiration date of a 20-year repair loan restrictive-use provision.

93.    Campbell and Rae chose the effective prepayment date of June 30, 2021, in order to ensure Buckeye's prepayment eligibility because, given that Campbell had learned that repair loans were subject to 20-year restrictive-use provisions (I/73:3-9), they knew that the effective date of their prepayment request therefore "had to be after the expiration of the 20-year period." (I/74:18-19.)

**The "Market Value" Appraisal**

94.    On August 20, 2021, nearly one year after Buckeye submitted its prepayment request but less than two months following the presumed expiration of the repair loan restrictive-use provision on June 26, 2021, RD's then Branch Chief (V/12:12-13) responded to Buckeye's request with a General Incentive Offer. (App. Ex. S at 1 of 3.)

95.    Proceeding per the various conditions required by ELIHPA, Campbell rejected the General Incentive Offer on September 28, 2021, and requested that RD "continue to process my request to pay the mortgage in full." (*Id.* at 3 of 3.) In the alternative, Buckeye would "proceed with a sale to a nonprofit at market value according to [the] requirements in the program." (II/11:18-12:1.)

96.     During this process, Rae began communicating about Buckeye's prepayment clause with Ms. Marion Canady, a Finance & Loan Analyst in RD's Processing & Report Review Branch 1, through a series of e-mails between February and April of 2022. (App. Ex. AA; *see, also, generally* II/12:3-18:15.)

97.      Those communications included forwarding various correspondence drafted by Canady and signed by Jonathan Bell, Canady's supervisor and RD's Director of the Processing and Report Review Branches. (I/5:13-14, V/3:12-15.)

98.     Reviewing this correspondence, Rae testified that the beginning stages of the process appeared to be progressing, with (1) Canady confirming that any "non-profit" buyer would be subject to use restrictions (App. Ex. AA at 24 of 27), and (2) RD conducting its civil rights (*i.e.,* the "adverse impact" on minorities) and "no need" analyses (II/17:13-18:14). Rae did not dispute these positions because they were expected and consistent with the ordinary Section 515 process. (*See id.*)

99.     The prepayment process exhibited its first "hiccup" on March 24, 2022, when Mr. Bell wrote Plaintiff a letter stating, in pertinent part, that the "loan is currently subject to Restrictive[-]Use Provisions [sic] until August 25, 2039 [*i.e.*, until the end of the initial mortgage loan's full 50-year term]" and thus Plaintiff is "ineligible for any incentives to avert prepay," meaning that Plaintiff "must continue to honor [its] current restriction until it expires" on "August 25, 2039." (App. Ex. T at 1 of 5.)

100.    This letter confused Rae because 2039 constituted the final year of the initial mortgage loan, not twenty years from the subsequent repair loan's closing, as Plaintiff expected and as was required by applicable regulations. (*See* II/17:21-19:17.)

101.    Bell also advised Plaintiff that it did not satisfy the conditions of ELIHPA's "no need" exception in that, while RD had determined that prepayment would *not* adversely affect minorities, Sierra Verde *was* needed in the community to provide affordable housing for low-income residents. (App. Ex. T at 1 of 5.)

102.    Bell provided Plaintiff with several alternative options, including the option of offering "the property for sale to non-profit organizations and public agencies in accordance with 7 CFR 3560.658(d) and 7 CFR 3560.659, and as further described in the MFH Handbook 3, Chapter 15, Section 3, Subsection 15.24." (*Id.*; *see, also,* App. Ex. BB at 1-2 of 6.) This option aligned perfectly with Rae's expectation, working closely with Campbell, to "sell to a nonprofit" and, in doing so, "get an appraisal based on market value." (II/19:20-20:3.)

103.    Rae testified that "the course we wanted to take . . . with the process" was to offer Sierra Verde for "sale to a nonprofit at a market value . . . ." for 180 days " (II/21:10-12.)  "At the end of the 180 days, if there's no offer or no contract, then you're out of the program." (II/21:12-14.) Rae therefore "moved past" his initial confusion about the alleged "Restrictive[-]Use Provisions" [sic] and chose the option of selling to a "Non-Profit or Public body" and leaving the program. (*Id.*; App Ex. T at 3 of 5.)

104.    Rae's expectations appeared realized on March 30, 2022, when Bell sent a second letter acknowledging Plaintiff's choice to offer Sierra Verde for sale at "market value" to nonprofit organizations and public agencies.

105.    Bell's letter, implicating the necessary application of the hypothetical condition, also contained the following language: "To establish the value of the property (*as an **unsubsidized conventional property***) and determine an acceptable offer, two independent 'as-is' ***market value*** appraisals will be completed in accordance with Chapter 7 of HB-1-3560." (App. Ex. U at 1 of 3; *see* App. Ex. BB at 2 of 6 (emphases supplied).)

106.    This second letter "thrilled" Campbell and Rae as it confirmed their expectation of obtaining an appraisal based on "much higher" market rents outside of the Section 515 Program. (II/23:20, 26:4-5.) Thus, Campbell signed the "Agree [sic] to Advertise and Sell to a Nonprofit" on March 31, 2022. (App. Ex. U at 3 of 3.)

107.    However, RD next provided Plaintiff with a bureaucratic form called the "Requestor's Proposed Appraised Value Type(s)" form (the "Appraised Value Type(s) Form" or the "Form") and found at page 7 of RD's Multifamily Housing Project Information for Appraisal Request. (App. Ex. V.)  As discussed below, the Form is contrary – not only to RD's previous position – but to all applicable statutory law, to all RD regulations, and to RD's own Agency handbook.

108.    The Form, filled out by RD, directs the appraiser, at "Box No. 3," to value Sierra Verde "*subject to* all restrictions and prohibitions currently existing, including restrictive-use provisions, pursuant to 7 C.F.R. § 3560.752**(b)(1)(ii)** [sic] (emphasis supplied)". (App. Ex. V at 7 of 7 ("Box No. 3"); *see, also, generally* II/24:8-26:15.)

109.    Contrary to Paragraph 5 of the ELIHPA mandate, the Form's terms entail that the premise of what is known within the industry as the "hypothetical condition" does *not* apply and that Sierra Verde is to be appraised at the restricted rent levels existing within the Section 515 Program, that is, as a *subsidized* property rather than as an *unsubsidized* conventional property.

110.    Confused by the RD turnabout from requiring a valuation of Sierra Verde pursuant to the hypothetical condition that it is "an *unsubsidized* conventional property" to its valuation as a *subsidized* property, and alarmed that the "market value" appraisal consequently would be conducted by utilizing the much lower "restricted rents" within the Section 515 Program (II/25:19-26:5), Rae sought clarification from RD.

111.    Rae believed that RD, instead of selecting Box No. 3 of the Form, should instead have selected "Box No. 4," requiring that rents be appraised while premised upon the application of the "hypothetical condition" that Sierra Verde was *unrestricted* even though all Section 515 properties by definition are *restricted*. (II/ 26:6-15.) Accordingly, selecting Box No. 4 of the Form would have been consistent with

1    the Agency handbook (App. Ex. B at 2 of 6) as well as RD's letters dated March 24 and March 30 of 2022.

2    (*See* II/26:16-22.)

3    112.    On April 12, 2022, Rae and Canady discussed RD's turnabout over the telephone, and Canady

4    agreed with Rae that the appraisal should provide an <u>unrestricted</u> market valuation for the property.

5    (II/30:18-24; App. Ex. AA at 4 of 27.)

6    113.    Canady also e-mailed Rae on April 12th to confirm that per HB-1-3560 "[a] market value

7    concluded for the property would be based on the hypothetical condition that the property is a <u>conventional</u>

8    (market) property, which it is not. *Uniform Standards of Professional Appraisal Practice* (emphasis

9    supplied)." (*Id*. at 2 of 27.)

10    114.    Rae questioned RD's position through further communications with Canady and then with Mr.

11    Daniel Hollander, an RD appraiser. (App. Ex. AA at 2-7 of 27; II/28:24-32:12.)

12    115.    On the same day, April 12, 2022, Mr. Hollander confirmed RD's new position that Box No. 3,

13    based upon "restricted rents," must be selected.  (App. Ex. AA at 5 of 27; II/29:19-22.) After learning that

14    RD's position may have related to a restrictive-use provision, Rae asked Canady where she was "seeing

15    the restrictive[-]use provisions in [Buckeye's] documents. I don't see any RUC on title." (*Id*. at 1 of 27.)

16    116.    Canady responded on April 14, 2022, by advising Rae that her Supervisor (Bell) believed that Box

17    No. 3 of the Appraised Value Type(s) Form was appropriate after all due to the "restrictive language"

18    within the 2001 deed of trust. (*Id*.)

19    117.    For the first time, Canady informed Rae that this "restriction" was in effect for the full term of the

20    repair loan mortgage, with a maturity date of June 26, *2031* (*Id*.; II/31:19-32:12), rather than the August

21    25, *2039* maturity date of the initial mortgage loan that Bell had referenced in his letter dated March 24,

22    2022. (*See* Paragraph No. 99 above.)

118.    Rae was confused once again because, rather than heading toward prepayment, Canady was now "saying the restrictions have to stay on the property for – until 2031." (II/31:19-24.) He was confused because he didn't "know why she didn't choose August 25, 2039." (II/32:8-12.) Like Campbell, he reasonably yet mistakenly interpreted the full term of this mortgage language in the 2001 deed of trust merely as an indication of when Buckeye's participation in the Section 515 Program would end.

119.    At the time of the repair mortgage loan's closing in 2001, Campbell mistakenly believed that the full term of this mortgage language now flagged by RD as a restrictive-use provision expiring in 2031 accomplished nothing other than a summary of ELIHPA's repudiatory language – namely that Buckeye could not exercise its contractual termination option for the full-term of its initial mortgage loan ending on August 25, 2039. (I/67:18-68:4.)

120.    In short, neither Campbell nor Rae had any reason to associate the 2001 deed of trust with an agreed-upon restrictive-use provision limited to the duration of the subsequent repair loan mortgage ending in 2031.

121.    On April 18, 2022, Rae wrote Canady a letter to "clear up some confusion" regarding Buckeye's prepayment request. (App. Ex. X at 1 of 3.)

122.    Rae's letter confirmed in writing what they had discussed on the phone, namely that RD's March 30, 2022, letter – which called for an appraisal of the property "as an unsubsidized conventional property" (see Paragraph No. 105 above) – was correct because both RD's regulations and its Agency handbook required that the appraisal provide an unrestricted market valuation "as an unsubsidized conventional property," not one that considers existing restrictive-use provisions. (*Id*. at 2 of 3.)

123.    Rae asked Canady to correct the Appraisal Value Type(s) Form to select Box No. 4, not Box No. 3, because Box No. 4 allows valuations based upon the "hypothetical condition as-if conventional

1    housing" consistent with RD's own prior position and with applicable law, including ELIHPA's mandate,

2    ELIHPA's implementing regulations, and its Agency handbook. (*Id.* at 3 of 3.)

3    124.    On April 28, 2022, Bell responded to Rae's letter. (App. Ex. Y at 1 of 1.) Bell stated that "General

4    Incentive offers were issued erroneously as it was later discovered that the Deed of Trust dated June 26,

5    20*21* [sic], contained a [restrictive-use provision]." (*Id.* (emphasis supplied).) Bell further stated that,

6    "[b]ased upon the existing [restrictive-use provision], which expires on June 26, 2031 [*i.e.,* the end of the

7    subsequent repair loan mortgage's 30-year term], the property does not qualify for a prepayment incentive

8    offer and [thus] Box #3 . . . should have been checked [*i.e.,* property to be appraised subject to restricted

9    rents]." (*Id.*)

10    125.    Presumably, Bell intended to argue that Sierra Verde had not actually qualified to receive any

11    incentives offers because the *2001* (not *2021*) deed of trust contained a restrictive-use provision that

12    extended until at least June 26, *2031*, if not until *2039*. (*Cf.* Bell's reference to a 2039 termination date in

13    his March 24, 2022, letter described above at Paragraph Nos. 99-102.)

14    126.    Since both dates were well beyond the effective date of Buckeye's prepayment request on June

15    30, 2021, such that the property was subject to an active restrictive-use provision as of said date of the

16    requested prepayment, Bell's apparent conclusion was that RD's prior issuance of a General Incentive

17    Offer had been improper.

18    127.    In short, Bell stated that RD had properly selected Box No. 3, which directed the *restricted*

19    valuation of the property, even though just 29 days earlier, on March 30, 2022, he had directed that it be

20    appraised as if it were "an unsubsidized *conventional* property." (*See* Paragraph No. 105 above; App. Ex.

21    U at 1 of 3.)

22    128.    Rae testified that this letter constituted the first time that RD had notified Buckeye of this alleged

23    error. (II/36:6-22.)

129.     Despite his exhortations during the hearing, Bell failed to identify a single statute, regulation, or policy authorizing RD to insert a full term of this mortgage restrictive-use provision into a repair loan. (V/3:12-36:21.)

130.     Bell acknowledged that the Agency handbook, as cited in RD's appeal record and with which he – as Director of the Processing and Report Review branches – was very familiar, mandates that subsequent repair loans include a "new 20-year restrictive-use period" that "begins as of the date of loan closing." (V/34:2-35:19; Agency Rec. at 36-37; App. Ex. H at 10 of 11.)

131.     In response to RD's adverse decision dated April 28, 2022, wherein Mr. Bell concluded that Box # 3 of the Form was properly checked because the 2021 deed of trust's restrictive use provision disqualified Sierra Verde from a prepayment incentives offer, and that any appraisal therefore would be conducted pursuant to the (incorrect) "market value, subject to restricted rents" methodology, Plaintiff filed an appeal on May 6, 2022, to the USDA's NAD. (App. Ex. Z at 1 of 17.)

132.     On March 29-30, 2023, Plaintiff participated in an administrative hearing regarding the matters at issue herein before an Administrative Law Judge. Despite Plaintiff's request that Canady – who was supervised by Bell – be made available at said hearing, as well as Plaintiff's attempt to subpoena her testimony, RD failed and refused to produce Canady at any point during said hearing.

133.     RD justified its refusal to produce Canaday by claiming Bell would be able fully to explain the reason(s) why RD changed positions, *i.e.,* why it first offered Plaintiff an *unrestricted* market valuation for the property and then revoked that offer to require a *restricted* valuation. But Bell ultimately testified that he virtually never spoke with Canady and could provide no explanation whatsoever for RD's change of position, let alone what Canady was thinking. (V/24:7-30:6, 32:9-16; *see, also,* V/34:21-36:1.)

134.    Plaintiff does have reason to know, however – from Canady's e-mail message dated February 11, 2022 – that at all relevant times she was fully aware of the purported full-term of this mortgage restrictive-use provision contained in the 2001 deed of trust. (App. Ex. AA at 24 of 27; II/14:5-10.)

135.    Given this, one or both of two conclusions can be deduced about Canady's state of mind on March 30, 2022, when she confirmed that Sierra Verde was entitled to a "market value" appraisal as if it was an unsubsidized conventional property:

> (1) RD mistakenly utilized a full term of this mortgage restriction and that the repair loan restrictive-use provision should have had an expired 20-year term, and/or
>
> (2) ELIHPA required a "market value" appraisal irrespective of the existence of an active restrictive-use provision of any term duration (and therefore whether or not the property qualified for incentives offers).

136.    Because of RD's refusal to permit Canady's testimony during the hearing, she was not able to explain her decision, and Plaintiff has been precluded from ascertaining whether she maintained both positions or only one or the other.

137.    Whichever position it was, however, Canady's initial decision on behalf of RD to offer a "market value" appraisal to Plaintiff accords with the Plaintiff's positions herein.

138.    RD's refusal to produce Canady, even after Plaintiff placed her on its witness list and subpoenaed her, should have resulted in an adverse inference against RD, as it had the exclusive power to produce her and Canady's testimony would have provided needed context to the transaction.

139.    Canady's testimony would not have contributed only "marginally" to RD's satisfaction of its burden of proof. Canady was the main RD staff member who made initial decisions on behalf of RD and drafted key letters for Bell's signature. And Bell himself testified that he virtually never spoke with Canady and possessed no knowledge about what she was thinking when she made her decisions. (V/24:7-30:6.)

140.    The Administrative Law Judge's failure to find an adverse inference against RD constitutes clear error and consequently it would be appropriate for this Court to draw the adverse inference that Canady made her decisions on behalf of RD based upon either one or both of the above identified beliefs discussed in Paragraph No. 135.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

141.    Plaintiff has exhausted its administrative remedies.

142.    Plaintiff received an adverse decision from RD on April 28, 2022.

143.    Plaintiff appealed to the NAD on May 11, 2022.

144.    Plaintiff participated in an administrative hearing before an Administrative Law Judge of the NAD on March 29-30, 2023.

145.    The Administrative Law Judge determined that RD's decision was not erroneous on November 3, 2023.

146.    Plaintiff requested review by the Director of the NAD of the Administrative Law Judge's determination on December 6, 2023.

147.    The NAD Director upheld the Administrative Law Judge's decision on February 13, 2024.

148.    Plaintiff requested reconsideration of the NAD Director's decision on February 26, 2024, and Plaintiff was again denied relief by the Director on April 8, 2024, with the Director noting this determination was "final" and judicial review is available "pursuant to 7 U.S.C. § 6999."

149.    7 U.S.C. § 6999 states, "A final determination of the [National Appeals] Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of title 5."

**SUMMARY GROUNDS OF ADMINISTRATIVE PROCEDURE ACT VIOLATIONS**

**I.  ELIHPA'S STATUTORY MANDATE FOR A "MARKET VALUE" APPRAISAL**

**(RD Improperly Denied Plaintiff's Statutory Right to a "Market Value" Appraisal – Irrespective of the Existence of Any Active Restrictive-Use Provision of Any Term Duration – Premised on the Hypothetical Condition that Sierra Verde is on the Open Market and "Unaffected" by Section 515 Restrictions, Even Though It Is)**

150.    RD improperly denied Plaintiff the ELIHPA-mandated independent "market value" appraisal in a sale to any qualified nonprofit organization or public agency. (Paragraph (5)(A) of ELIHPA (Add. at 1).)

151.    RD's implementing regulations mandate that, for the purposes of establishing a sales price in any sale to a qualified nonprofit organization or public body, two independent appraisals "will conclude *market value* and be in accordance with **subpart P** of this part. . ." (7 C.F.R. § 3560.659(a) (Add. at 3) (emphasis supplied).)

152.    "Subpart P. Appraisals" of 7 C.F.R. provides in part that, where the appraisal Type of Value request indicates that **"*market value, subject to restricted rents*"** is to be concluded, "the appraisal will take into consideration any rent limits, rent subsidies, expense abatements, or *restrictive-use conditions* that *will affect* the property as a result of an ***agreement*** with RD or any other ***financing*** source (emphases supplied)." (7 C.F.R. § 3560.752(b)(1)(i) ("Subpart P at **(b)(1)(i)**") (Add. at 5) (emphases supplied).)

153.    The restrictive-use provision at issue in this action and discussed at length below is appended to, and made part of an agreement with, RD as a financing source in the form of Exhibit A to the Deed of Trust for Arizona on the USDA/Rural Housing Service Standard Form RD 3550-14 AZ. (App. Ex. Q at 8 of 9.)

154.    "Subpart P. Appraisals" of 7 C.F.R. also provides that, where the appraisal Type of Value request indicates that **"*market value*"** is to be concluded, "the appraisal will take into consideration the most probable price which a property should bring in a competitive and open market . . . under conditions whereby:  (E) The *price* represents the normal consideration for the property sold ***unaffected*** by special

1   or creative **financing** . . . by *anyone associated* with the sale." (7 C.F.R. §3560.752(b)(1)(ii) ("Subpart P

2   at **(b)(1)(*ii*)**" (Add. at 4) (emphases supplied).)

3   155.    Pursuant to Subpart P at **(b)(1)(*ii*)**'s "market value" definition, no directive exists requiring that

4   the appraisal take into consideration restrictive-use conditions that will affect the property as a result of

5   an agreement with RD as a financing source, such as the restrictive-use provision at issue here and

6   discussed extensively below.

7   156.    On the contrary, the "market value" definition specifically directs that the price will represent the

8   normal consideration for the property sold **unaffected** by special or creative financing by RD or anyone

9   else associated with the sale.

10  157.    Since both ELIHPA and 7 C.F.R. § 3560.659(a) mandate appraisals that will conclude **"*market*

11  *value*"** and not **"*market value, subject to restricted rents*,"** Subpart P at **(b)(1)(*ii*)** and not Subpart P at

12  **(b)(1)(*i*)** unquestionably applies.

13  158.    Thus, the provision of Subpart P at **(b)(1)(*i*)** ("*market value, subject to restricted rents*") that

14  requires the appraisal to take into consideration any *restrictive-use conditions* that **will affect** the property

15  as a result of an **agreement** *with RD* or any other **financing** source, simply does not apply.

16  159.    Rather, the provision of Subpart P at **(b)(1)(*ii*)** ("*market value*") that requires the appraisal to take

17  into consideration the most probable *price* for the property to be sold **unaffected** by special or creative

18  **financing** *by anyone associated* with the sale, does apply.

19  160.    In conceptualizing the "market value" of housing *restricted* within the context of the Section 515

20  affordable housing program, one cannot lose sight of the fact that selling properties *without restrictions*

21  nonetheless constituted the objective utilized by the Government to incentivize the private sector's very

22  participation in the Section 515 Program.

161.     Accordingly, the term "market value" is both universally recognized and specifically defined *to preclude* the consideration of any Section 515 restrictions, including restrictive-use provisions, as reflected by the definition contained in Subpart P at (b)(1)(ii).

162.     By reason of the tension between this definition of "market value" and the reality of the affordable housing program in which Section 515 properties operate, a methodology is required to assess the "market value" of affordable housing properties even though they exist within the confines of the restricted Section 515 Program. That methodology is referred to as the "hypothetical condition."

163.      The hypothetical condition assumes that properties such as Plaintiff's Section 515 property, Sierra Verde, are on the "open market" and "unaffected" by any Section 515 Program Agency financing agreements, even though they are affected.

164.     As stated in Attachment 7-A (Value Types Used in Multi-Family Appraisals) to the Agency's handbook, "[t]he ***market value*** of a Section 514/515 housing project is always based on a ***hypothetical condition***, which is defined by the 4th Edition of <u>The Dictionary of Real Estate Appraisal</u> as, 'that which is contrary to what exists but is supposed for the purpose of analysis (emphases original).'" (HB-1-3560 (Add. at 2).)

165.     As also stated in the Agency handbook, "[m]ost appraisers and users of Agency Multi-Family Housing ***appraisals*** understand the definition of ***market value*** to mean the value as a ***conventional or unrestricted*** or **market property** (emphases original)." (*Id.*)

166.     The Agency handbook continues: "An ***existing 514/515 apartment complex*** that is the subject of an ***appraisal*** ordered by RD is ***subsidized (restricted)*** at the time of the **appraisal**. A ***market value*** concluded for the property would be based on the ***hypothetical condition*** that ***the property is a conventional (market) property, which it is not***. . . ." (*Id.* (emphasis supplied).)

167.    The Agency handbook continues further, at Section 15.26 entitled "ESTABLISHING THE PROJECT VALUE" that immediately follows the section entitled "SALE TO A NON-PROFIT OR PUBLIC BODY [7 CFR 3560.659]," as follows:   "To establish the value of the property (***as an unsubsidized conventional property***) and determine an acceptable offer, two independent 'as-is' market value appraisals will be completed in accordance with Chapter 7 of HB-1-3560." (App. Ex. BB at 2 of 6 (emphases supplied).)

168.    Pursuant to RD's Appraised Value Type(s) Form (the "Form"), RD conditions (at Box Nos. 3 and 4) the availability of a valuation as an unsubsidized conventional property pursuant to the hypothetical condition only for those Section 515 properties that qualify for prepayment incentives offers pursuant to ELIHPA.

169.    As alleged below, RD determined that Plaintiff did not qualify for prepayment incentive offers because Sierra Verde was allegedly subject to an active restrictive-use provision.

170.    Accordingly, RD determined that Sierra Verde was not eligible for the application of the hypothetical condition and, therefore, also precluded from obtaining a "market value" appraisal.

171.    Limiting the application of the hypothetical condition to those Section 515 properties without active restrictive-use provisions effectively eliminates the utilization of the hypothetical condition. Moreover, making the hypothetical condition available only to those Section 515 properties with no active restrictive-use provision defeats the very purpose of having the hypothetical condition, *i.e.,* the availability of a hypothetical condition intended to evaluate a ***restricted*** property as unrestricted becomes illusory when the property is already ***unrestricted.***

172.    During the NAD hearing, RD offered only the presence of Box Nos. 3 and 4 of the Form to justify its position that it could properly condition the application of the hypothetical condition, and thereby the

availability of a "market value" appraisal, upon an owner's/developer's qualification for prepayment incentives offers.

173.    RD did not object to, or otherwise disagree with Plaintiff's expert witness – a prominent former official of RD – who stated that the condition appeared to be based upon a misinterpretation of a clause contained in RD's own Agency handbook providing that "[a] hypothetical condition should only be used to **determine value** when the property qualifies for an Incentives Offers [sic] according to 7 C.F.R. §3560.656." (App. Ex. F at 5 of 24; emphasis original.)

174.    In short, the referenced Agency handbook clause is ambiguous because, in isolation, it can be interpreted in one of two ways: (i) that the hypothetical condition **only** applies to those properties that qualify for prepayment incentives offers according to 7 C.F.R. §3560.656 (qualifying the availability of such incentives offers upon the absence of any active restrictive-use provision); or (ii) that when a property qualifies for incentives offers according to 7 C.F.R. §3560.656, **only** the hypothetical condition should be used to determine value.

175.    Even though 7 C.F.R. §3560.656(c)(1)(i) requires – similar to the second interpretation above – that **only** the hypothetical condition can be used in determining the value of the return on equity incentives offer, the Form adopts the first interpretation above.

176.    The second interpretation of the Agency handbook clause constitutes the correct one considering the fact that 7 C.F.R. §3560.656(a)(1) obligates RD to determine "market value," "based on an appraisal conducted in accordance with subpart P of this part" the application of which requires, pursuant to Subpart P at **(b)(1)(ii)**'s definition of "market value," the use of the hypothetical condition to determine value.

177.    By virtue of RD's failure during the NAD hearing to offer any supporting fact or law for its administrative Form, conditioning Plaintiff's right to the application of the hypothetical condition required to obtain a "market value" appraisal upon Plaintiff's qualification for incentives offers, RD's

1    determination that Plaintiff is not entitled to a "market value" appraisal constitutes conduct that is

2    arbitrary, capricious, an abuse of discretion, or is otherwise not in accordance with law.

3    178.    Moreover, the Form's requirement that the hypothetical condition can **never** apply to Section 515

4    properties with active restrictive-use provisions is invalidated by the unconditional "market value"

5    mandate in ELIHPA Paragraph (5)(A) presupposing that the hypothetical condition **always** requires that

6    restricted Section 515 properties be considered as unaffected by such restrictions because Section 515

7    properties, by definition, always are restricted.

8    179.    Similarly, the Form directly contravenes the "market value" definition in Subpart P at **(b)(1)(*ii*)**

9    that requires the application of the hypothetical condition to all Section 515 properties with active

10   restrictive-use provisions by virtue of that clause's directive that Section 515 properties be considered as

11   if "**unaffected**" by special or creative financing contained in any agreement with RD, even though they

12   are **affected.**

13   180.    In short, the Form – granting an owner/developer the right to a "market value" appraisal only

14   when its Section 515 property qualifies for prepayment incentives offers – has absolutely no basis either

15   in fact or in law. Rather, the Form's focus on conditioning the right to a "market value" appraisal on a

16   property's qualification for incentive offers evidently is based on nothing other than a misguided

17   interpretation of the Agency handbook.

18   181.    RD is not allowed to circumvent clear statutory and regulatory prohibitions through a backdoor

19   misinterpretation (real or imagined) of its own handbook, memorialized in a Form.

20   182.    The right of a Section 515 owner/developer such as Plaintiff, to a "market value" appraisal in the

21   sale of its property to any qualified nonprofit organization or public agency is mandatory and therefore

22   unconditional pursuant to ELIHPA Paragraph (5)(A) and its implementing regulations.

23

## II.  INVIOLABILITY OF MITIGATING CONDUCT

**(Given ELIHPA's Repudiation of Plaintiff's Contractual Termination Option, RD Caused Plaintiff Further Harm by Abusing a Restrictive-Use Provision Associated with Plaintiff's Mitigating Conduct of Accepting Post-ELIHPA Repair Loan Funds to Improperly Deny Plaintiff's Statutory Right to a "Market Value" Appraisal)**

183.    Following ELIHPA's repudiation of Plaintiff's contractual termination option, Plaintiff chose from a limited menu of available options when it required funds for the reparation of Sierra Verde.

184.    Due to ELIHPA's repudiation of the contractual termination option, Plaintiff was no longer able to convert Sierra Verde to market at will and obtain standard commercial financing to cover such expenses at any point before the initial mortgage's maturation date in 2039.

185.     Therefore, Plaintiff opted to accept repair loan funds offered by RD in 2001.

186.    RD appended as Exhibit A to Plaintiff's 2001 deed of trust an unauthorized full term of this mortgage restrictive-use provision rather than the legally-mandated 20-year term restrictive-use provision.

187.    Plaintiff's decision to accept the repair loan constitutes an act of mitigation. The law is clear that acts of mitigation cannot be employed to cause the victim of a breach further harm.

In other words, the restrictive-use provision appended by RD to the 2001 deed of trust – no matter what the duration of its term – cannot now be used to deny Plaintiff the "market value" appraisal to which it otherwise would be entitled pursuant to ELIHPA, the same offending statute that compelled Plaintiff to seek a ***restricted*** repair loan from RD rather than what would have constituted an ***unrestricted*** repair loan from a commercial financing source.

### III.  UNAUTHORIZED RESTRICTIVE-USE PROVISION

**(Reformation of the Restrictive-Use Provision at Issue is Required by Reason that RD – Without any Legal Authorization Whatsoever – Appended a Full Term of This Mortgage Restrictive-Use Provision to the Repair Loan Rather than the Twenty-Year Provision Required by Federal Law and Improperly Denied Plaintiff's Statutory Right to a "Market Value" Appraisal)**

188.    Pursuant to RD's Appraised Value Type(s) Form, the availability to an owner/developer of a "market value" appraisal in the sale to any qualified nonprofit organization or public agency is predicated upon that owner's/developer's qualification for prepayment incentives offers under ELIHPA.

189.    Since incentives offers are not available regarding any owner's/developer's property subject to an active restrictive-use provision (*see* 7 C.F.R. §3560.656(a)(2) (App. Ex. G at 1 of 4)), RD determined that the purported full term of this mortgage restrictive-use provision appended to the 2001 deed of trust disqualified Plaintiff from any incentives offers, thereby also precluding Plaintiff from obtaining a "market value" appraisal.

190.    The full term of this mortgage restrictive-use provision that RD appended to the 2001 deed of trust is not authorized by law and therefore is invalid.

191.    All valid RD regulations specifically mandate a 20-year term duration for restrictive-use provisions for all subsequent repair loans and do not grant RD any discretion to lengthen the duration of that term.

192.    Such a valid 20-year restrictive-use provision would have expired on June 26, 2021, four days before the June 30, 2021, effective date of Plaintiff's subject prepayment request.

193.    Plaintiff therefore was, in fact and law, eligible to receive incentives offers given what should have been the absence of any active restrictive-use provision on the effective date of its prepayment request.

194.    Indeed, the sole fact that – pursuant to RD's misinterpretation of its Agency handbook – the Form improperly conditions the statutory right to a "market value" appraisal upon the availability of prepayment

1    incentives offers entails, in and of itself, that said condition fails in the face of ELIHPA's mandate for the

2    provision of a "market value" appraisal.

3    195.    In short, if RD had not mistakenly utilized a full term of this mortgage restriction and instead

4    appended to Plaintiff's repair loan the 20-year restrictive-use provision required by federal law, no active

5    restrictive-use provision would have existed on the effective date of Plaintiff's prepayment request giving

6    rise to RD's incentives offer, thereby effectuating Plaintiff's eligibility – even under RD's

7    misapprehension of its own Agency handbook and the resultant spurious Form – for both said incentives

8    offer and a "market value" appraisal.

9    196.    Thus, even according to RD's misinterpretation of its own Agency handbook and the Form – to

10    the effect that a property's *ineligibility* for incentives offers *disqualifies* it from a "market value" appraisal

11    – because Plaintiff's property was, in fact, *eligible* for incentives offers it is, accordingly, *qualified* for a

12    "market value" appraisal.

13    197.    Pursuant to ELIHPA and its implementing regulations, Plaintiff is entitled to a "market value"

14    appraisal of its property in a sale to a qualified nonprofit organization or public agency. While the evidence

15    presented at the NAD hearing and the allegations herein support a ruling in its favor on all three of the

16    above grounds, Plaintiff submits that each ground stands alone and that, accordingly, this Court must rule

17    in Plaintiff's favor and grant the relief requested if it rules in favor of Plaintiff on any one of them.

18

19

# CLAIMS FOR RELIEF

## COUNT ONE

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – 706(2)(A)
### (Arbitrary, Capricious, and Contrary to Law)

**(RD Improperly Denied Plaintiff's Statutory Right to a "Market Value" Appraisal – Irrespective of the Existence of Any Active Restrictive-Use Provision of Any Term Duration – Based on the Hypothetical Condition that Sierra Verde is on the Open Market and "Unaffected" by Section 515 Restrictions, Even Though It Is)**

**ELIHPA, 7 CFR § 3560.659(a), 7 CFR § 3560.752(b)(1)(i), and 7 CFR § 3560.752(b)(1)(ii)**

198.    Plaintiff incorporates paragraphs 1 through 198 by reference as if fully set forth herein.

199.    RD's failure and refusal to apply the "market value" appraisal required by applicable law constitutes an agency action under the Administrative Procedure Act (the "APA").

200.    Pursuant to 5 U.S.C. § 702, the APA governs the review of agency action where a person has suffered a "legal wrong" or has been "adversely affected or aggrieved by agency action."

201.    It is understood that in an APA suit, the court's review is largely limited to the contents of the administrative record and that the court sits as an appellate tribunal to determine whether, as a matter of law, the record supports RD's decision.

202.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (5 U.S.C. § 706(2)(A).)

203.    Pursuant to this standard of review, RD's decision will be reversed if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before RD, or it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[.]" (*DHS v. Regents of the Univ. of Cal*, 140 S. Ct. 1891, 1913 (2020).)

204.    RD's failure and refusal to permit the proper application of the "market value" appraisal required by applicable law, without the creation of any condition unauthorized by law, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because applicable Agency rules, regulations, federal statutes including ELIHPA, and RD's own Agency handbook dictate that a "market value" appraisal should be applied to Sierra Verde premised upon the "hypothetical condition" that the property comprises market-rate or conventional housing unaffected by any Section 515 restrictions, including any alleged active restrictive-use provision of any term duration.

205.    RD is mandated by applicable law including ELIHPA, Agency regulations, and the Agency handbook to permit Plaintiff to exercise its right, without condition or reservation, to a "market value" appraisal, premised upon the aforementioned "hypothetical condition," in the sale of Sierra Verde to any qualified nonprofit organization or public agency.

206.    Setting aside the fact that, as discussed more fully below, Sierra Verde's restrictive-use provision expired on June 26, 2021 pursuant to applicable law and even assuming that an active restrictive-use provision was in effect, Plaintiff was nonetheless entitled to offer to sell Sierra Verde to any qualified nonprofit organization or public agency at a fair "market value" determined by two independent appraisers based upon the hypothetical condition that Sierra Verde is unaffected by special or creative financing.

207.    ELIHPA Paragraph 5(A) mandates that:

> [i]f the Secretary determines after a reasonable period that an agreement [to new use restrictions] will not be entered into with a borrower under paragraph (4), the Secretary *shall* require the borrower (except as provided in subparagraph (G)) to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a *fair market value determined by 2 independent appraisers*[.]

(U.S.C. § 1472(c)(5)(A)(i) (emphasis supplied); *see also* Add. at 1.)

208.    Applicable RD guidelines and regulations clearly mandate how a "market value" appraisal should be applied to Sierra Verde:

The Agency handbook states that "[t]he market value of a Section 514/515 housing project is always based on a hypothetical condition, . . . " and properly recognizes that "[a] market value concluded ['at the time of the appraisal'] for the property would be based on the hypothetical condition that the property is a conventional (market) property, which it is not. . . ."; (*See* Add. at 2.)

"Implicit in this definition [of a 'market value' appraisal requirement] is the consummation of a sale . . . under conditions whereby . . . [t]he price represents the normal consideration for the property sold *unaffected* by special or creative financing . . ." (Add. at 4 (emphasis supplied).)"

7 C.F.R. § 3560.659(a) also requires that, for "the purposes of establishing a sales price when a borrower is required or elects to sell a housing project to a nonprofit organization[,] . . . appraisals will conclude market value and be in accordance with subpart P of this part." (*See* Add. at 3.)

209.    Subpart P. Appraisals, 7 CFR § 3560.752(b)(1), defines two types of market valuation: **"*market value, subject to restricted rents*"** and **"*market value.*"** (*See* Add. at 4 and 5.)

210.    **"*Market value, subject to restricted rents*"** is defined to mean that an appraisal "will take into consideration any rent limits, rent subsidies … or restrictive-use conditions that will affect the property as a result of an agreement with RD or any other financing source." (*See* Add. at 5 (7 CFR § 3560.752(b)(1)(i).)

211.    But for the purposes of establishing a sales price when a borrower is required or elects to sell a Section 515 property to a nonprofit organization or public body, neither ELIHPA nor 7 CFR § 3560.659(a) mandates **"*market value, subject to restricted rents.*"**

212.    Instead, ELIHPA and RD regulation both specifically require that the appraisals determine **"*market value.*"** And RD regulation at 7 CFR § 3560.659(a) also requires that the determination of **"*market value*"** "be in accordance with subpart P of this part. . . ." (*See* Add. at 1 and 3.)

213.    **"*Market value*"** is defined at Subpart P. Appraisals, 7 CFR § 3560.752(b)(1)(ii) (Subpart P at **(b)(1)(*ii*)**") as

tak[ing] into consideration the most probable price which a property should bring in a *competitive and open* market under all conditions requisite to a fair sale, the

buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: … (E) The price represents the normal consideration from the property sold *unaffected* by special or creative financing.

(*See* Add. at 4 (emphasis supplied).)

214.    Unlike the definition of "market value, subject to restricted rents," the term "market value" does not include the terms "rent limits," "rent subsidies," or "restrictive-use conditions."

215.    Nor does Subpart P at **(b)(1)(*ii*)** contain any other conditions even hinting that those concepts have any relevance to a determination of "market value." Instead, "market value" is explicitly defined as the price for the property if it is sold, ***unaffected*** by special financing.

216.    Since the property *is* restricted and ***affected*** by special financing, including RD loan agreements, promissory notes, and deeds of trust, Subpart P at **(b)(1)(*ii*)** requires an appraiser to apply the hypothetical condition that the property is unaffected by any rent limits, rent subsidies, or restrictive-use conditions that will affect a Section 515 property as a result of an agreement with RD or any other financing source and which are specifically required to be taken into consideration when the value type specified is "market value, subject to restricted rents" defined by Subpart P at **(b)(1)(*i*)**.

217.    The Agency Handbook, which provides guidance to its personnel as they implement statutory and regulatory requirements, contains additional language that clarifies and reinforces what "market value" and "sold unaffected" by special financing mean.

218.    For example, Chapter 15.26 of HB-3-3560 confirms that, in connection with a sale to a "Non-Profit or Public Body *[7 CFR 3560.659]*," "[t]o establish the value of the property (***as an unsubsidized conventional property***) and determine an acceptable offer, two independent 'as-is' ***market value*** appraisals will be completed in accordance with Chapter 7 of HB-1-3560." (App. Ex. BB at 2 of 6 (emphasis supplied).)

219.    Moreover, the Agency handbook at Attachment 7-A to Chapter 7 provides that

> [t]he **market value** of a Section 514/515 housing project is always based on a **hypothetical condition**, which is defined by the 4th Edition of <u>The Dictionary of Real Estate Appraisal</u> as, 'that which is contrary to what exists but is supposed for the purpose of analysis.' An existing 514/515 apartment complex that is the subject of an appraisal ordered by RD is subsidized (restricted) at the time of the appraisal. A market value concluded for the property would be based on the **hypothetical condition** that the property is a **conventional** (market) property, which it is not. (App. Ex. B at 1-2 of 9 (emphasis supplied).)

220.    Despite RD's failure to identify a single statute, regulation, or other legal justification that would properly allow for the application of a "market value, subject to restricted rents" appraisal, the NAD denied Plaintiff any relief whatsoever.

221.    As a result of RD's actions and inactions, Plaintiff has incurred significant costs and attorney's fees and has been deprived of the "market value" appraisal to which it is entitled by law.

**COUNT TWO**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – 706(2)(C)**
**(In Excess of Statutory Authority)**

**(RD Improperly Denied Plaintiff's Statutory Right to a "Market Value" Appraisal – Irrespective of the Existence of Any Active Restrictive-Use Provision of Any Term Duration – Based on the Hypothetical Condition that Sierra Verde is on the Open Market and "Unaffected" by Section 515 Restrictions, Even Though It Is)**

**ELIHPA, (Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988), *codified as amended at* 42 U.S.C. § 1472(c) (Add. at 1)**

222.    Plaintiff incorporates paragraphs 1 through 221 by reference as if fully set forth herein.

223.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." (5 U.S.C. § 706(2)(C).)

224.    No statutory provision authorizes RD to create any condition, including but not limited to any owner's/developer's eligibility for incentives offers, upon that owner's/developer's statutory entitlement

to a "market value" appraisal in the sale of its property to any qualified nonprofit organization or public agency pursuant to the above-discussed ELIHPA mandate.

225.    RD and its personnel therefore have acted in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in creating the condition that Plaintiff must be eligible for an incentives offer before the application of the hypothetical condition can be permitted to entitle Plaintiff to a "market value" appraisal in the sale of Sierra Verde to any qualified nonprofit organization or public agency pursuant to the ELIHPA mandate.

226.    In addition or in the alternative, on information and belief, RD has acted in excess of statutory authority by withholding approvals for other Agency personnel to allow Plaintiff to exercise its statutory right to a "market value" appraisal in the sale of Sierra Verde to any qualified nonprofit organization or public agency.

227.    Despite RD's failure to identify any statutory or other legal justification for the application of conditions to Plaintiff's statutory entitlement to a "market value" appraisal in the sale of its property to any qualified nonprofit organization or public agency pursuant to the ELIHPA mandate, the NAD denied Plaintiff any relief whatsoever.

228.    RD's interpretation fails to capture the single best meaning of Section 515 that its text and accompanying resources and related law suggest and is therefore impermissible. (*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)).

229.    As a result of RD's actions and inactions, Plaintiff has incurred significant costs and attorney's fees and has been deprived of the "market value" appraisal to which it is statutorily entitled.

# COUNT THREE

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – 706(2)(A)
### (Arbitrary, Capricious, and Contrary to Law)

**(Given ELIHPA's Repudiation of Plaintiff's Contractual Termination Option, RD Improperly Caused Plaintiff Further Harm by Utilizing the Restrictive-Use Provision Associated with Plaintiff's Mitigating Conduct in Accepting Available Post-ELIHPA Repair Loan Funds to Deny Plaintiff's Statutory Right to a "Market Value" Appraisal)**

***Franconia Associates v. United States*, 61 Fed. Cl. 718, 741 (2004) (non-repudiating party should not be penalized for acts taken in mitigation of that repudiation)**

230.    Plaintiff incorporates paragraphs 1 through 229 by reference as if fully set forth herein.

231.    RD's failure and refusal to apply the "market value" appraisal on the basis of an allegedly active restrictive-use provision, part of an act of Plaintiff's mitigation in response to the Government's repudiation in the form of ELIHPA, constitutes an agency action under the APA.

232.    RD's failure and refusal to apply the proper, regulatorily mandated "market value" appraisal was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because closing on the repair loan constituted an act of mitigation in response to the Government's own repudiation of its contract with Plaintiff, and RD cannot employ such an act of mitigation and its associated restrictive-use provision to deny Plaintiff its right to a "market value" appraisal.

233.    Accordingly, any reliance by RD or any other Defendant on Plaintiff's subsequent repair loan, or any restrictive-use provision associated therewith, for purposes of penalizing Plaintiff even further, is contrary to law because entering into the repair loan constitutes an act of mitigation by Buckeye in response to the Government's own repudiation.

234.    Following the Supreme Court's recognition that "ELIHPA effected a repudiation of the [RD] contracts" (*Franconia Assoc. v. United States*, 536 U.S. 129, 143 (2002)), the Court of Federal Claims reasoned that "a plaintiff is not required to mitigate losses by 'accepting an arrangement with the breaching

1    party made conditional on the plaintiff's surrender of its rights under the repudiated contract.'" (*Franconia*

2    *Assoc. v. United States*, 61 Fed. Cl. 718, 741 (2004)).

3    235.    Thus, Plaintiff's mitigating conduct in the form of accepting a subsequent restrictive-use provision

4    required for a repair loan not available from commercial sources cannot be made conditional on the

5    surrender of its rights to a "market value" appraisal that would have been available to it but for ELIHPA's

6    repudiation of its contract – particularly where ELIHPA itself actually mandates a "market value"

7    appraisal under the conditions at issue here.

8    236.    The *Franconia* court specifically stated that "reasonable cost-avoiding steps include affirmative

9    efforts to make substitute arrangements compensating for the lack of performance" and included as an

10    example of permissible mitigating conduct those Section 515 property owners who receive loans "in

11    exchange for extending their housing agreements" (*id.* at 746), including those who "accepted loans from

12    the FmHA [RD] because, due to the restrictions imposed under the program, that was the only available

13    way to finance needed maintenance and improvements." (*Id.* at 741, 746 n.47.)

14    237.    Here, RD's or any other Defendant's failure and refusal to recognize Plaintiff's repair loan and its

15    associated restrictive-use provision as an act of mitigation and using the same as the justification to deny

16    Plaintiff its right to a "market value" appraisal is improper and reviewable under 5 U.S.C. § 702.

17    238.    Despite the impropriety of RD using Plaintiff's act of mitigation to deny Plaintiff its entitlement

18    to a "market value" appraisal premised upon the aforementioned "hypothetical condition," the NAD

19    denied Plaintiff any relief whatsoever.

20    239.    As a result of RD's actions and inactions, Plaintiff has incurred significant costs and attorney's

21    fees, has been deprived of the "market value" appraisal to which it is entitled, and has been subjected to

22    an allegedly continuing, burdensome restrictive-use provision of varying term durations in response to

23    Plaintiff's mitigation efforts.

**COUNT FOUR**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – 706(2)(A)**
**(Arbitrary, Capricious, and Contrary to Law)**

**(Reformation of the Restrictive-Use Provision at Issue is Required by Reason that RD – Without any Legal Authorization Whatsoever – Improperly Appended a Full Term of This Mortgage Restrictive-Use Provision to the Subsequent Repair Loan Rather than the 20-Year Provision Required by Agency Regulation and Thereby Denied Plaintiff's Statutory Right to a "Market Value" Appraisal)**

**7 C.F.R. § 1944.237(e) and Exhibits to Subpart E of Part 1965**

240.    Plaintiff incorporates paragraphs 1 through 239 by reference as if fully set forth herein.

241.    An RD regulation contemporaneous to the closing of the 2001 Deed of Trust, appropriately titled "Subsequent loans" (7 C.F.R. § 1944.237), required that "Subsequent loans, other than those made to a nonprofit corporation or public agency to avert prepayment, will be subject to the restrictive-use provisions contained in exhibit A–1 of subpart E of part 1965 of this chapter." (7 C.F.R. § 1944.237(e) (2001); App. Ex. I at 1 of 10.)

242.    The referenced exhibit A-1 of subpart E lays out the required restrictive-use provisions for subsequent loans made by RD: "The restrictions are applicable for a ***term of 20 years*** from the date on which the last loan was closed . . . ." (7 C.F.R. Part 1965, Subpt. E, Ex. A-1 (2001); App. Ex. I at 4 of 10; (emphasis supplied).)

243.    Furthermore, the specific clause language required to be used by RD, provided by the referenced, controlling exhibit A-1, states as follows:

> The borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in section 514 or section 515 of title V of the Housing Act of 1949, as amended, and FmHA or its successor agency under Public Law 103–354 regulations then extant ***during this 20 year period*** . . . .

(*Id.* (emphasis supplied).)

244.    In the over twenty years since the closing on the repair loan, applicable regulations have evolved, but a 20-year restrictive-use provision has always been required for subsequent loans. A full term of this mortgage restrictive-use provision has never been an option. (*See, e.g.,* 7 C.F.R. § 3560.662 (2024).)

245.    RD's own Agency handbook, as cited in RD's appeal record, mandates that "[w]hen a subsequent loan is made, a new 20-year restrictive-use period on the project begins as of the date of loan closing." (App. Ex. H at 10 of 11; Agency Rec. at 36-37; V/34:2-35:19.)

246.    RD's failure and refusal to provide Plaintiff with a "market value" appraisal – pursuant to the prepayment request submitted on behalf of Buckeye with an effective date of June 30, 2021 – on the basis of an allegedly active restrictive-use provision – which in fact and law expired on June 26, 2021 – constitutes an agency action under the APA.

247.    RD's refusal to recognize the proper, regulatorily mandated expiration of the restrictive-use provision contained in Plaintiff's deed of trust for the subject repair loan was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because applicable rules and regulations clearly dictate that only a 20-year restrictive-use provision applies to subsequent repair loans.

248.    For subsequent repair loan restrictive-use provisions, regulations have drawn a clear line in the sand of 20 years from loan origination. They have explicitly dictated the ***only*** period for which RD may restrict a subject property.

249.    RD's crossing of its own regulatory line in the sand by attempting to enforce a full term of this mortgage loan – whether extending (i) until 2031, concurrent with the end of the repair loan's mortgage, or (ii) until 2039, concurrent with the end of the underlying, original mortgage – properly leads to only one result:  the alleged full term of this mortgage restrictive-use provision must be reformed, at least to the extent it exceeds RD's regulatory authority for a term of 20 years.

250.    A borrower cannot waive a regulatory requirement simply by signing documents in a form dictated by RD.

251.    Thus, Campbell's execution of the full term of this mortgage deed of trust language does not constitute a waiver of the regulatorily required 20-year term for the repair loan's restrictive-use provision.

252.    Furthermore, RD's failure and refusal to permit the proper, regulatorily mandated "market value" appraisal was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because RD's justification for its application of the incorrect "market value, subject to restricted rents" appraisal was based on an allegedly active restrictive-use provision for Sierra Verde, ignoring the fact that the only such restrictive-use provision authorized by law expired on June 26, 2021, pursuant to RD regulations.

253.    RD's application of an unauthorized restrictive-use provision to Plaintiff's deed of trust was improper and is reviewable under 5 U.S.C. § 702.

254.    RD cannot utilize a restrictive-use provision, whose term of duration is contrary to RD regulations and other applicable law, to deny Plaintiff its entitlement to a "market value" appraisal premised upon the aforementioned "hypothetical condition."

255.    RD's power and authority were limited to applying a restrictive-use provision duration term of 20 years, and Plaintiff's repair loan deed of trust should be reformed accordingly.

256.    Both parties hereto mistakenly agreed to the "full term of this mortgage" restriction appended to the 2001 deed of trust.

257.    RD mistakenly utilized a full term of this mortgage restriction that was not authorized by federal law.

258.    Campbell, having no reason to question the propriety of the documents placed before him at the loan closing, mistakenly presumed that they did accord with federal law. He also reasonably yet mistakenly believed, along with Rae (who saw no restrictive-use provision on the title), that the "full term

of this mortgage" language, appended as Exhibit A to the 2001 deed of trust, signified nothing other than that – pursuant to the statutory requirements of ELIHPA – Plaintiff already was obligated to remain in the Section 515 Program until the 2039 expiration of its original mortgage loan.

259.    Accordingly, Plaintiff and RD both mistakenly agreed to an unauthorized full term of this mortgage restriction:  RD mistakenly believed this unauthorized language reflected federal law, and Plaintiff mistakenly believed it simply constituted a reiteration of what ELIHPA already required.

260.    Reformation of government contracts based on mutual mistake of fact and/or law has been granted in numerous cases, particularly when affirmative government action is involved.

261.    Despite RD's failure to identify a single rule or regulation that properly allows the application of anything other than a 20-year restrictive-use provision for a subsequent repair loan (V/32:17-36:1), the NAD denied Plaintiff any relief whatsoever.

262.    As a result of RD's actions and inactions, Plaintiff has incurred significant costs and attorney's fees, has been deprived of the "market value" appraisal to which it is entitled, and has been subjected to a continued, burdensome purported full term of this mortgage restrictive-use provision of varying term durations that should be reformed as having expired on June 26, 2021, pursuant to RD's own regulations.

## COUNT FIVE

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – 706(2)(C)
### (In Excess of Statutory Authority)

**(Reformation of the Restrictive-Use Provision at Issue is Required by Reason that RD – Without any Legal Authorization Whatsoever – Improperly Appended a Full Term of This Mortgage Restrictive-Use Provision to the Subsequent Repair Loan Rather than the 20-Year Provision Authorized by Federal Statute and Thereby Denied Plaintiff's Statutory Right to a "Market Value" Appraisal)**

**42 U.S.C. § 1485(a), 42 U.S.C. § 1472(c)(1)(A)(ii), 42 U.S.C. § 1480(k), 7 C.F.R. § 3560.662**

263.    Plaintiff incorporates paragraphs 1 through 262 by reference as if fully set forth herein.

264.    Section 515 incorporates the terms of Sections 514/516. *See* 42 U.S.C. § 1485(a) ("The Secretary is authorized to make loans [pertaining to Section 515] . . . in accordance with terms and conditions substantially identical with those specified in section 1472 of this title [relating to Sections 514/516]. . .").

265.    Pursuant to 42 U.S.C. § 1472(c)(1)(A)(ii), regarding Sections 514/516, the general rule is that any loan cannot be prepaid or refinanced unless it is restricted for a period of "twenty years."

266.    Plaintiff's repair loan qualifies as a prepayable loan. (App. Ex. P at 2 of 3.)

267.    Accordingly, as a Section 515 loan subject to the terms and conditions substantially identical with those specified in 42 U.S.C. § 1472(c)(1)(A)(ii), RD was required by federal statute to append a twenty-year restrictive-use provision to Plaintiff's repair loan.

268.    Furthermore, pursuant to the Secretary's authorization under 42 U.S.C. § 1480(k) (to "make such rules and regulations as he deems necessary to carry out the purposes of this subchapter"), RD promulgated a regulation pertaining to the facts of this action that concludes, in conformance to the authorizing federal statutes, with the general rule requiring a restrictive-use provision of "20 years." (7 C.F.R. § 3560.662(b)(6); App. Ex. H at 4 of 11.)

269.    No statutory provision authorized RD to apply anything other than a twenty-year restrictive-use provision to the 2001 Deed of Trust for Plaintiff's repair loan at issue here.

270.    Accordingly, RD and its personnel have acted in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in purporting to apply a full term of this mortgage restrictive-use provision of varying term durations, rather than the statutorily authorized twenty-year term duration, to the 2001 deed of trust for Plaintiff's repair loan at issue here.

271.    In addition, or in the alternative, on information and belief, RD has acted in excess of statutory authority by withholding approvals for other RD personnel to interpret the 2001 deed of trust for Plaintiff's repair loan at issue here as properly requiring a twenty-year restrictive-use provision.

272.    Despite RD's failure to identify any statutory or other legal justification for the proper application of any full term of this mortgage restrictive-use provision as opposed to the twenty-year restrictive-use provision authorized by federal statutes for the 2001 deed of trust for Plaintiff's repair loan at issue here, the NAD denied Plaintiff any relief whatsoever.

273.    As a result of RD's actions and inactions, Plaintiff has incurred significant costs and attorney's fees, has been deprived of the "market value" appraisal to which it is entitled, and has been subjected to a continued, burdensome purported full term of this mortgage restrictive-use provision of varying term durations, most recently purporting to expire in 2039, that should be reformed as having expired on June 26, 2021, pursuant to authorizing statutes.

## COUNT SIX

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – 706(2)(E)

### (Unsupported by Substantial Evidence on the Record of an Agency Hearing)

### (RD Improperly Denied Plaintiff's Statutory Right to a "Market Value" Appraisal Due to the Absence of any Statutory and/or Regulatory Support for Said Denial Offered by RD Before, During, or After the NAD Hearing Held in this Matter)

274.    Plaintiff incorporates paragraphs 1 through 273 by reference as if fully set forth herein.

275.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." (5 U.S.C. § 706(2)(E).)

276.    Despite RD's failure to identify any statutory, regulatory, or other legal justification for its denial of Plaintiff's statutory and regulatory entitlement to a "market value" appraisal in the sale of its property to any qualified nonprofit organization or public agency pursuant to the ELIHPA mandate and RD's implementing regulations dictating that a "market value" appraisal should be applied to Sierra Verde premised upon the "hypothetical condition" that the property comprises market-rate or conventional

1    housing unaffected by any section 515 restrictions, including any alleged active restrictive-use provision

2    of any term duration, the NAD denied Plaintiff any relief whatsoever.

3    277.    Despite RD's failure to identify any statutory or other legal justification for the application of

4    conditions to Plaintiff's statutory entitlement to a "market value" appraisal in the sale of its property to

5    any qualified nonprofit organization or public agency pursuant to the ELIHPA mandate, the NAD denied

6    Plaintiff any relief whatsoever.

7    278.    Despite RD's failure to identify any legal or logical justification calling into question the legal

8    doctrine precluding RD from utilizing Plaintiff's act of mitigation in obtaining a subsequent repair loan,

9    including a purported full term of this mortgage restrictive-use provision of any term duration, to deny

10   Plaintiff its entitlement to a "market value" appraisal mandated by ELIHPA, the NAD denied Plaintiff

11   any relief whatsoever.

12   279.    Despite RD's failure to identify a single rule, regulation, or other legal justification for the proper

13   application of a full term of this mortgage restrictive-use provision to the 2001 deed of trust for Plaintiff's

14   repair loan at issue here, as opposed to the 20 year restrictive-use provision authorized by Agency

15   regulation (*see* V/32:17-36:1), the NAD denied Plaintiff any relief whatsoever.

16   280.    Despite RD's failure to identify any statutory or other legal justification for the proper application

17   of a full term of this mortgage restrictive-use provision to the 2001 deed of trust for Plaintiff's repair loan

18   at issue here, as opposed to the twenty year restrictive-use provision authorized by federal statute, the

19   NAD denied Plaintiff any relief whatsoever.

20   281.    Despite RD's failure to identify any legal and/or logical justification for the proper application of

21   a ***"market value, subject to restricted rents"*** appraisal to the sale of Sierra Verde to any qualified nonprofit

22   organization or public agency in the face of the ELIHPA mandate for a ***"market value"*** appraisal for such

23   a sale, the NAD denied Plaintiff any relief whatsoever.

1    282.    As a result of RD's wholly unsupported actions and inactions, Plaintiff has incurred significant

2    costs and attorney's fees, has been deprived of the "market value" appraisal to which it is entitled, and has

3    been subjected to a continued, burdensome purported full term of this mortgage restrictive-use provision

4    of varying term durations that should be reformed to have expired on June 26, 2021, pursuant to the

5    authorizing statutes and implementing regulations.

6                                                    **PRAYER FOR RELIEF**

7          **WHEREFORE,** Plaintiff prays for judgment as follows:

8                                                    **AS TO COUNT ONE**

9    1.    That the Court declare that RD acted arbitrarily, capriciously, abused its discretion, or otherwise

10   acted not in accordance with law, when RD prohibited Plaintiff from obtaining a "market value" appraisal

11   in the sale of Sierra Verde to any qualified nonprofit organization or public agency as mandated by

12   ELIHPA and its implementing regulations.

13                                                   **AS TO COUNT TWO**

14   2.    That the Court declare that RD acted in excess of statutory jurisdiction, authority, or limitations,

15   or short of statutory right, when RD prohibited Plaintiff from obtaining a "market value" appraisal in the

16   sale of Sierra Verde to any qualified nonprofit organization or public agency as mandated by ELIHPA.

17                                                  **AS TO COUNT THREE**

18   3.    That the Court declare that Plaintiff's act of mitigation in obtaining a subsequent repair loan and

19   its associated restrictive-use provision of any term duration in response to the Government's own

20   repudiating conduct cannot be utilized by Defendants to cause Plaintiff further harm by denying its

21   entitlement to a "market value" appraisal mandated by ELIHPA.

22

23

**AS TO COUNT FOUR**

4.      That the Court declare that RD acted arbitrarily, capriciously, abused its discretion, or otherwise acted not in accordance with law, when RD concluded that Plaintiff's Section 515 property was subject to a purported full term of this mortgage restrictive-use provision of varying term durations rather than the 20 year restrictive-use provision authorized by RD's rules and regulations.

5.      That the Court, accordingly, declare that the restrictive-use provision appended to the 2001 deed of trust for Plaintiff's repair loan expired after 20 years, on June 26, 2021, as mandated by RD's applicable rules and regulations.

6.      That the Court thereby reform the 2001 deed of trust for Plaintiff's repair loan, and/or direct that the Defendants hereto so cause the reformation of the same, consistent with federal law to substitute the regulatorily mandated "20 years" from the date of loan closing restrictive-use provision for the purported full term of this mortgage restrictive-use provision of varying term durations not authorized by law.

**AS TO COUNT FIVE**

7.      That the Court declare that RD acted in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, when RD concluded that Plaintiff's Section 515 property was subject to a purported full term of this mortgage restrictive-use provision of varying term durations rather than the twenty year restrictive-use provision required by RD's authorizing statutes.

8.      That the Court, accordingly, declare that any restrictive-use provision associated with the 2001 deed of trust for Plaintiff's repair loan expired after twenty years, on June 26, 2021, as mandated by RD's authorizing statutes.

9.      That the Court thereby reform the 2001 deed of trust for Plaintiff's repair loan, and/or direct that the Defendants hereto so cause the reformation of the same, consistent with federal law to substitute the statutorily mandated "twenty years" from the date of loan closing restrictive-use provision for the

1    purported full term of this mortgage restrictive-use provision of various term durations not authorized by

2    applicable federal statutes.

3    ## AS TO COUNT SIX

4    10.    That the Court declare that RD improperly denied Plaintiff's statutory and regulatory right to a

5    "market value" appraisal mandated by ELIHPA and its implementing regulations despite RD's failure to

6    identify any statutory and/or regulatory support for said denial offered by RD before, during, or after the

7    NAD hearing held in this matter.

8    11.    That the Court declare that the RD improperly denied Plaintiff's statutory right to a "market value"

9    appraisal mandated by ELIHPA despite RD's failure to identify any statutory or other legal justification

10    for the application of conditions to Plaintiff's entitlement to the same before, during, or after the NAD

11    hearing held in this matter.

12    12.    That the Court declare that the RD improperly utilized Plaintiff's act of mitigation in obtaining a

13    subsequent repair loan and its associated restrictive-use provision of any term duration to deny Plaintiff

14    its entitlement to a "market value" appraisal mandated by ELIHPA despite RD's failure to identify before,

15    during, or after the NAD hearing held in this matter any legal or logical justification calling into question

16    the legal doctrine providing that a non-repudiating party should not be penalized for acts taken in

17    mitigation of the repudiation.

18    13.    That the Court declare that RD improperly appended a full term of this mortgage restrictive-use

19    provision to the 2001 deed of trust for Plaintiff's repair loan at issue here and utilized the same as

20    justification for RD's denial of Plaintiff's entitlement to a "market value" appraisal despite RD's failure

21    to identify before, during, or after the NAD hearing held in this matter a single rule, regulation, or other

22    legal justification allowing for the inclusion of anything other than the 20 year restrictive-use provision

23    authorized by Agency regulation.

14.     That the Court declare that RD improperly appended a full term of this mortgage restrictive-use provision to the 2001 deed of trust for Plaintiff's repair loan at issue here and utilized the same as justification for RD's denial of Plaintiff's entitlement to a "market value" appraisal despite RD's failure to identify before, during, or after the NAD hearing held in this matter any statutory or other legal justification allowing for the inclusion of anything other than the twenty year restrictive-use provision authorized by federal statute.

15.     That the Court declare that RD improperly applied a "***market value, subject to restricted rents***" appraisal to the sale of Sierra Verde to any qualified nonprofit organization or public agency in the face of the ELIHPA mandate for a "***market value***" appraisal for such a sale despite RD's failure to identify before, during, or after the NAD hearing held in this matter any legal and/or logical justification whatsoever for doing so.

## AS TO ALL COUNTS

16.     That the Court order Defendants to apply the "market value" appraisal method to Sierra Verde mandated by Paragraph (5)(A) of ELIHPA and 7 CFR § 3560.752**(b)(1)(*ii*)**.

17.     That the Court award Plaintiff its attorney's fees and costs as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

18.     That the Court award Plaintiff its costs and interest as allowed by law.

19.     That the Court grant such other and further legal and equitable relief as the law and the evidence may justify and as the Court may deem just and proper.

                                        Respectfully submitted,

                                        ECKLAND & BLANDO P.A.

Dated:  June 26, 2025                   /s/ Robert T. Dube, Jr.
                                        Jeff H. Eckland *(motion for admission forthcoming)*
                                        Vince C. Reuter *(motion for admission forthcoming)*
                                        Robert T. Dube, Jr. Esq. (D.C. Bar No. MN0018)
                                        Adrian E. Kipp *(motion for admission forthcoming)*
                                        100 Washington Avenue South
                                        Suite 1500
                                        Minneapolis, MN 55401
                                        Telephone: (612) 236-0160
                                        Facsimile: (612) 236-0179
                                        Email: jeckland@ecklandblando.com
                                               vreuter@ecklandblando.com
                                               rdube@ecklandblando.com
                                               akipp@ecklandblando.com

                                        *Attorneys for Plaintiff*

OF COUNSEL

Rosemary Szanyi (D.C. Bar No. 997859)
Christopher Yukins (D.C. Bar No. 420656)
ARNOLD & PORTER
        KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC   20001
Telephone:  (202) 942-6812
Facsimile:   (202) 942-5999
rosemary.szanyi@arnoldporter.com
christopher.yukins@arnoldporter.com